PER CURIAM.
Jonathan Lewis appeals from an order finding that he has no property rights to a dock area at his residential subdivision, The Anchorage. We reverse.
The first time these parties were before us, S & T Anchorage argued that the Anchorage Homeowner’s Association’s settlement and voluntary dismissal of its claim to use the dock area, that is part of the common area of the development, extinguished Lewis’s individual rights to the area. We held that the terms of the Declaration were *479 internally inconsistent, “creating a triable issue of fact whether Jonathan Lewis has individual rights separate and distinct from his derivative rights as a member of the Association,” and remanded the case for a determination of that issue. S & T Anchorage, Inc. v. Lewis, 575 So.2d 696 (Fla. 3d DCA1991).
On remand, the trial court ruled that under the Declaration, Lewis does have an individual right to assert his claim for an easement to use the dock area for passive purposes such as sunning, picnicking, and viewing Biscayne Bay. Nevertheless, it denied Lewis the requested relief, ruling that the Declaration granted no common dock area. We hold that in so ruling, the trial court disregarded the express unambiguous provision of the Declaration which states, “the Property contains a dock area which is part of the common area of the Property.” [1]
At the outset of the hearing on remand, counsel for Anchorage stipulated to the existence of a waterfront common area which included the dock area and harbor.
THE COURT: You’re saying that the Declaration defines the property as shown on the plat and defines common area as the plat less the lots?
MR. THOMSON: That’s correct, Your Honor.
THE COURT: So the common area, by subtracting one from the other, in this area that you just pointed out?
MR. THOMSON: Essentially it’s the roads.
THE COURT: The road and the dock area?
MR. THOMSON: Yes, Your Honor.
THE COURT: You concede those to be the common areas?
MR. THOMSON: Yeah, the dock area and the harbor, yeah.
THE COURT: So you concede those to be common areas?
MR. THOMSON: Yes, That’s what the Declaration says; property contains a dock area which is part of the common area of the property. That’s the first line of Article 8.
(Emphasis supplied). Mr. Thomson’s concession was consistent not only with the plain language of the Declaration, and with Anchorage’s position taken in the prior appeal, but also with the prior opinion of this court which recognized “The Declaration defined the common areas of the subdivision to include the dock area....” Lewis, 575 So.2d at 697.
Although the Declaration clearly stated that the dock area was part of the common area, neither the Declaration nor the plat (recorded years earlier) showed its physical boundaries. At trial, Lewis therefore sought to prove not the existence of a common dock area, but rather to define the physical boundaries of the common area. The evidence offered by Lewis to demonstrate the boundaries included sales materials, prepared contemporaneously with the Declaration and other documents prepared by or at the direction of Anchorage, portraying a waterfront peninsula with an access route four-feet in width.[2] See Easton *480 v. Appier, 548 So.2d 691 (Fla. 3d DCA1989) (extent of easement implied by a writing depends on the intent of the parties at the time of creation). The evidence presented by Lewis clearly demonstrated the grant- or’s intention, at the time of the recording of the Declaration, that the common “dock area” was the waterfront peninsula depicted in the brochures.
Further, in light of Anchorage's position in the prior appeal, recognizing the existence of common waterfront rights, and counsel’s stipulation on remand that there is a dock area which is part of the common area of the Anchorage subdivision, the court departed from established law in concluding that there was no common dock area. See Gunn Plumbing, Inc. v. Dania Bank, 252 So.2d 1, 4 (Fla.1971) (“A stipulation properly entered into and relating to a matter upon which it is appropriate to stipulate is binding upon the parties and upon the Court.”); New York Cent. Mut. Fire Ins. Co. v. Diaks, 69 So.2d 786, 787 (Fla.1954); Troup v. Bird, 53 So.2d 717 (Fla.1951). Lewis is entitled, as a matter of law, to a judgment affording him the right to use, and have reasonable access to, the common dock area.
On remand the court is to fix the boundaries of the common dock area consistent with the evidence presented at previous hearings, along with a four-foot wide access route to the dock which is least intrusive to other lots on the waterfront peninsula.
Reversed and remanded for further consistent proceedings.
SCHWARTZ, C.J., and FERGUSON, J., concur.

. The recorded Declaration which expressly granted a dock area as part of the subdivision’s common area was incorporated into Lewis’s contract and deed, therefore, Lewis’s easement was created by a duly-executed writing as required by the Statute of Frauds. See Canell v. Arcola Housing Corp., 65 So.2d 849 (Fla.1953).

. This evidence included:
a.Lewis Exits. 7 and 15: A black and white, Treister & Cantillo folded brochure, admittedly prepared by the developer which was given to Lewis and Ostrovsky in connection with the purchase of their lots, which states:
All of the residents will commonly own a waterfront peninsula, which will be theirs to enjoy for sunning, fishing, parties or simply for the unsurpassed view of the bay.
b. Lewis Exh. 6: A folded Jeanne Baker, Inc. brochure of the home ultimately purchased by Lewis entitled "The Anchorage.” The brochure is in color and contains the same depiction of the waterfront peninsula in the same coloring as the common area roadway ("Anchorage Way”) and a walled access route, also shaded as part of the common area.
c. Lewis Exh. 9: A folded Merrill Lynch Realty brochure entitled "Villa Ipe at the Anchorage.” This color brochure depicts the subdivision and shows the same waterfront peninsula and walled access route shaded as part of the common area.
d. Lewis Exhs. 11, 22: These price lists, prepared by the developer for use in the sale of the lots in the subdivision contain: (i) a general description of the property including "ac *480 cess to the waterfront" and (ii) the same 14,-810 square footage for Lot # 8 which excludes the waterfront peninsula and walkway thereto.
e. Lewis Exh. 10: A blue-print dated September 23, 1983, prepared by the developer’s architects, Treister & Cantillo, depicting the same access route, waterfront peninsula and square footage of Lot #8 (excluding the waterfront peninsula and walkway), which was given to Mr. Ostrovsky in early 1987.
f. Lewis Exhs. 17 and 21: Multiple listing service brochures for the Marymont and Villa Ipe homes, each of which indicates “ocean access” or "acc to ocean”, and on one of which, one of the developer’s brokers photocopied the same depiction found on the color brochures and the black and white brochure (showing a pathway to the waterfront peninsula.).